### NEW ÆTNA PORTLAND CEMENT CO. v. HATT.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1916.)

No. 2696.

1. MASTER AND SERVANT ☞125(9)—MASTER'S LIABILITY FOR INJURY TO SERVANT—DEFECTIVE MACHINERY—KNOWLEDGE OF VICE PRINCIPAL.

The superintendent in charge of a manufacturing plant owned and operated by a foreign corporation represents the corporation as to employés, and his knowledge of defects in machinery or appliances is attributable to his principal.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 251; Dec. Dig. ☞125(9).]

2. MASTER AND SERVANT ☞201(3)—ACTION FOR INJURY TO SERVANT—DEFENSES.

Where defects in machinery, of which the master was charged with notice by reason of the knowledge of its superintendent, rendered unsafe the place where an employé was required to work, it is not a defense to an action for his death from such cause that the danger might have been obviated by certain action by fellow employés outside of their regular duties, when there was no rule or direction of the superintendent requiring such action.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 518-523; Dec. Dig. ☞201(3).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. MASTER AND SERVANT ⊙⟶201(3)—MASTER'S LIABILITY FOR INJURY TO SERVANT—CONCURRING NEGLIGENCE OF FELLOW SERVANTS.

A master is not relieved from liability for injury to an employé resulting from defective machinery by the fact that there was concurring negligence on the part of fellow servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 518–523; Dec. Dig. ⊙⟶201(3).]

4. MASTER AND SERVANT ⊙⟶288(5)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ASSUMPTION OF RISK.

An employé, killed by an explosion of coal dust at the place where he was working, which had accumulated because of the leaking condition of an elevator device, *held* not shown to have had such knowledge of the danger and of the surrounding conditions as to charge him, as matter of law, with having assumed the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1077; Dec. Dig. ⊙⟶288(5).]

5. COURTS ⊙⟶348—FEDERAL COURTS—PRACTICE IN—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

In the federal courts, in an action for the injury or death of an employé, the burden of proving contributory negligence rests on the defendant, regardless of any contrary rule in the state courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 922; Dec. Dig. ⊙⟶348.]

6. MASTER AND SERVANT ⊙⟶265(14)—ACTION FOR DEATH OF SERVANT—CONTRIBUTORY NEGLIGENCE—PRESUMPTION.

Where an employé was killed by an explosion in the room where he was required to work, in the absence of any evidence to the contrary there is a presumption that he was in the performance of his duties and exercising due care for his own safety.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 893, 908; Dec. Dig. ⊙⟶265(14).]

7. TRIAL ⊙⟶108½—EXAMINATION ON VOIR DIRE—DISCRETION OF COURT.

In an action against a manufacturing corporation to recover for the death of an employé, it was not error for the court in the exercise of its discretion to permit plaintiff's counsel, in the examination of jurors on their voir dire, to ask each separately whether he had ever been in the insurance business, and whether he had ever been agent for a particular insurance company named.

[Ed. Note.—For other cases, see Trial, Dec. Dig. ⊙⟶108½.]

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action at law by Edmurson Hatt, administrator of the estate of William² Lynn Hatt, deceased, against the New Ætna Portland Cement Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Luman W. Goodenough and Irvin Long, both of Detroit, Mich., for plaintiff in error.

Claude H. Stevens, of Detroit, Mich., and Benj. F. Reed, of Lapeer, Mich., for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and COCHRAN, District Judge.

WARRINGTON, Circuit Judge. The administrator recovered judgment against the cement company for alleged negligence resulting

in the death of his intestate. At the date of the death the company was maintaining a cement factory in Genesee county, Mich., and operating the factory both day and night. The portions of the factory which are important here were the coal room and kiln room. The deceased was in the employ of the company and worked at night in the coal room as an oiler. It is enough to say of the process of manufacture that a mixture of marl and clay, called "slush," was pumped into rotating kilns, maintained in the kiln room, and fused into pellets of various sizes through the application of heat generated by burning coal dust. The coal dust was obtained by passing bituminous slack coal through grinders and dryers in the coal room; 92 per cent. of the product would pass through a 100-mesh sieve—as the company's chemist stated, it was "as fine as flour." After the coal was so pulverized and dried, it was carried by gravity through a slightly inclined tube into the lower portion of an elevator which was maintained near the southeast corner of the coal room and within about 4 feet of a brick wall separating that room from the kiln room. The elevator stood in an open concrete pit, some 4½ feet in depth below the level of the floor and extending into the coal room a distance of 3 to 4 feet from the west and south sides of the lower portion of the elevator, called the "boot." The elevating device extended from the floor of the pit to a cupola at the roof of the building, and was incased in sheet steel or iron. The elevator was originally designed for carrying all the coal dust from the boot to a point in the cupola, where provision was made for discharging the dust into a screw conveyer and transferring it thence to the kilns of the kiln room.

The casing surrounding the boot of the elevator had fallen into such disrepair as to admit of the escape of coal dust into the pit. It was not an uncommon occurrence to allow the coal dust there to accumulate to a depth of several feet. When these accumulations were suffered to remain in the pit for a time not definitely shown—the company's chemist being of opinion that they would not "get afire, if cleaned out every 12 hours"—the dust would develop heat to the degree of spontaneous combustion. This was a source of danger to employés, since, as the witnesses in substance say, any appreciable quantity of coal dust falling directly upon the burning portion of the dust, and so as to mix with air at the place of contact, would result in an "explosion," as some of the witnesses term it, but rather, as we understand, in a dangerous flash of fire. Indeed, while no witness was produced who saw the deceased at the moment he received his injuries, the facts and circumstances shown justify the conclusion, and it is virtually conceded, that he was so badly burned by one of these so-called explosions as to cause his death some hours later.

The day foreman sought to avoid the explosions. One method was to "wet the dust down" by the application of water from a hose conveniently located; but in practice this would cause the fire to smoulder; it would not extinguish the fire. Another plan of the foreman was to remove the accumulations to a place outside of the factory; this, however, was done only in daytime and at irregular intervals, some extending over several days; there was no rule charging

the duty of removal upon any particular employés, and the day foreman himself usually made such removals as occurred. It is true that one of the witnesses said the coal dust so accumulating could be returned to the elevator and carried thence to its normal destination, but admittedly this was impracticable after spontaneous combustion had set in and water had been applied. Further, the day foreman called the attention of Mr. Bumps, who was superintendent of the entire plant, to the defective condition of the portion of the elevator in question, stating, "I talked with Mr. Bumps about it, and he told me he ought to fix it up," and also stating that the superintendent "would not give a man time to repair it, or fix it up, because he wanted the machinery kept going."

At the close of all the evidence the company moved that a verdict be directed in its favor, relying in substance upon the grounds: (a) Negligence of fellow-servants; (b) assumption of risk; (c) contributory negligence; (d) decedent was not at the time of receiving his injury engaged "in the course of his business or employment." The motion was denied. The company then presented requests for special instructions to the jury, which were in substantial accord with the grounds relied on in the motion to direct. The contention made here is to the same effect.

[1] The theory of the defense overlooks, in the first place, the company's responsibility for the continuing state of disrepair of the elevator casing. The company is a corporation organized and existing under the laws of the state of Maine, and, so far as appears here, Superintendent Bumps was its principal and controlling representative in Michigan; concededly he was the vice principal. Clearly, the company was chargeable through him with knowledge of the unsafe conditions prevailing at the elevator pit. Leonard Martin Const. Co. v. Highbarger, 175 Fed. 340, 342, 343, 99 C. C. A. 128, and citations (C. C. A. 6th Cir.). It is sought to excuse the company as respects the holes in the casing by reason of chemical conditions causing it to rust out quickly; but this could not absolve the company from a reasonable discharge of its continuing duty to maintain a safe place to work (Kreigh v. Westinghouse & Co., 214 U. S. 249, 256, 29 Sup. Ct. 619, 53 L. Ed. 984); and here weeks, if not months, were allowed to elapse without attempting to repair or replace the defective parts of the casing.

[2, 3] It is in effect urged that the dangers arising from this apparent neglect of the company should have been avoided by the employés through proper care of the pit; that this was a mere detail of the work which could rightfully be imposed upon them. If such a theory as this be accepted, it is enough to say that there was a total absence of system or rule created or imposed by the superintendent or any authorized official touching the treatment of coal dust escaping into the pit. It results that the company itself was guilty of negligence as to the continuing disrepair of the casing and the consequent and recurring dangers due to accumulations of coal dust in the elevator pit; and it is, therefore, not important whether the decedent's fellow servants were guilty of concurring negligence or not. Kreigh v.

Westinghouse & Co., supra, at page 257 of 214 U. S., 29 Sup. Ct. 619, 53 L. Ed. 984; Texas & Pacific Ry. v. Howell, 224 U. S. 577, 582, 32 Sup. Ct. 601, 56 L. Ed. 892; Standard Oil Co. v. Brown, 218 U. S. 78, 85, 30 Sup. Ct. 669, 54 L. Ed. 939; Grand Trunk Ry. Co. v. Cummings, 106 U. S. 700, 702, 1 Sup. Ct. 493, 27 L. Ed. 266; Bryson v. Gallo, 180 Fed. 71, 76, 103 C. C. A. 424 (C. C. A. 6th Cir.); Meers & Dayton v. Childers (decided by this court January 10, 1916) 228 Fed. 640, —— C. C. A. ——.

[4] As to assumption of risk, it cannot be said as matter of law, that the decedent comprehended the conditions which would bring about an explosion. True, he had worked in the same room and in the same capacity for a time during the working season of the previous year and for something like two months during the season in question. This, it must be conceded, was calculated to admonish him of the fact that explosions might occur; but it is not shown that he was ever advised or warned of the conditions that would produce an explosion, and in view of the nature of the conditions, as well as the circumstances shown, the question of decedent's appreciation of the risk was a question of fact. Casey-Hedges Co. v. Oliphant (decided January 4, 1916) 228 Fed. 636, —— C. C. A. ——; Adams v. Grand Rapids Refrigerator Co., 160 Mich. 590, 596, 125 N. W. 724, 27 L. R. A. (N. S.) 953, 136 Am. St. Rep. 454, 19 Ann. Cas. 1152; American Car & Foundry Co. v. Matzok, 228 Fed. 179, —— C. C. A. —— (C. C. A. 3d Cir.); and see Boston & M. R. v. Baxter, 228 Fed. 257, 262, —— C. C. A. —— (C. C. A. 1st Cir.). Shortly before the injury, it became necessary to repair the coal dust conveyer in the cupola, and the night foreman seems to have given directions to two men to make the repair; a ladder extended from the floor to a platform maintained about the cupola at a point some six feet below the top of the elevator; while the work was in progress upon the conveyer, the deceased received his injuries. It is shown that there were openings between the planks which formed the floor of the platform, and that considerable quantities of coal dust had gathered upon these planks. It does not appear, however, that the deceased had any duty calling him to the platform or that he was in fact upon it at the time the men were working there. The machinery in the cupola was oiled only in the daytime; it is open to fair inference that the decedent had no occasion at any time to go upon the platform; and, apart from the question of his knowledge of the conditions necessary to produce an explosion, it does not appear that he knew of the accumulations of coal dust on the platform. We think it is fairly deducible from all the proved facts and circumstances that the repairers, while moving about the platform, caused a considerable quantity of coal dust to fall from the planks and upon the coal dust in the elevator pit. Such conditions as these, when there was any fire in the pit, were the very ones that would produce an explosion, and it was open to the jury to find that the decedent was ignorant alike of this fact and also of the further fact that coal dust had gathered on the planks of the platform.

[5] As regards contributory negligence, it is to be remembered that under the well-settled rule prevailing in the federal courts, regardless

of any contrary rule existing in the state courts, the burden of proving negligence on the part of the deceased was upon the company. Tex. & Pac. Ry. v. Volk, 151 U. S. 73, 77, 78, 14 Sup. Ct. 239, 38 L. Ed. 78; Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 557, 11 Sup. Ct. 653, 35 L. Ed. 270; Indianapolis, etc., R. R. Co. v. Horst, 93 U. S. 291, 298, 23 L. Ed. 898; Erie R. Co. v. Weinstein, 166 Fed. 271, 274, 92 C. C. A. 189 (C. C. A. 6th Cir.); Horn v. Baltimore & O. R. Co., 54 Fed. 301, 304, 4 C. C. A. 346 (C. C. A. 6th Cir.); Missouri, K. & T. Ry. Co. v. Wilhoit, 160 Fed. 440, 443, 87 C. C. A. 401 (C. C. A. 8th Cir.); O'Hara v. Central R. Co. of New Jersey, 183 Fed. 739, 740, 106 C. C. A. 177 (C. C. A. 2d Cir.); Town of Watertown v. Greaves, 112 Fed. 183, 189, 50 C. C. A. 172, 56 L. R. A. 865 (C. C. A. 1st Cir.); Ellsworth v. Hunt, 168 Fed. 506, 510, 93 C. C. A. 662 (C. C. A. 7th Cir.). It cannot safely be said that the evidence even preponderates in favor of, much less that as matter of law it establishes, the defense of contributory negligence. It is urged that the deceased might have avoided the explosion by applying water to the coal dust in the pit. If it be assumed (it is not satisfactorily proved) that he had been instructed by the day foreman to "wet this coal (dust) down," the evidence fails to show that he did not; but, as we have seen, it is shown that such treatment would not put out the fire, and it is not claimed that the deceased was under any duty to remove the contents of the pit. It is scarcely necessary to add that while coal dust escaped from the coal grinders and settled in the coal room and about the machinery, yet this did not occur in such quantity at any single place as to result in spontaneous combustion. One of the uses for which the hydrant and hose were placed in the coal room, as stated, was to keep the floor wet; the day foreman had instructed the decedent to use the hose for that purpose; there is, however, no evidence tending to show that this duty was neglected, or that coal dust from these sources had anything to do with the explosion.

[6] As respects the claim that the decedent was not at the time of receiving his injuries engaged in the course of his employment, it is difficult to follow the argument. At one stage it is urged that the deceased had no duty calling him to the platform of the elevator; at another it is insisted that he might have received an order from the night foreman to go to the platform and render assistance to the repairers; but while the evidence sustains the former theory, it is wholly lacking as to the latter. It is shown that the duty of the deceased required him to be about the pit at times when oiling in the coal room. It is, therefore, plain enough that the deceased might well have received his injuries while in the discharge of his ordinary duties. It is worthy of remark that neither the night foreman nor the men working on the platform were called as witnesses. It is to be inferred from what was said in argument, that the night foreman and one of the repairers lost their lives in this explosion, and that the other repairer was absent from the district during the trial below. Humphrey, a cement burner, saw the reflection of the fire in the coal room, and in "about a minute" later saw Hatt (the decedent), with his clothing on fire, running toward him from the coal room, when he discovered that

Hatt's body was badly burned. Since Hatt met his death from this cause within a few hours, we think the jury might have believed that at the time of receiving his injuries he was engaged in the performance of his duty. Stephenson v. Brick & Tile Co., 151 Iowa, 373, 130 N. W. 586, concerned an employé who had been fatally injured while in charge of a hoisting machine, and who, it seems, had survived his injuries some appreciable length of time. There were no eyewitnesses of the accident, and under a claim of contributory negligence error was assigned to a special instruction which permitted the jury "to consider the instincts of men which naturally lead them to avoid danger." In passing upon this instruction it was said (151 Iowa, 379, 130 N. W. 589):

"As there were no eyewitnesses of the accident, the instruction is correct unless the physical facts, taken in connection with the other testimony, show without question that the deceased could not have received his injuries except he were in a position where he had no right to be or in such a position that he must be held guilty of contributory negligence in assuming that position."

And again (151 Iowa, 380, 130 N. W. 589):

"We must assume, then, giving heed to the instinct of self-preservation common to mankind in general, that deceased was exercising due care for his own safety in performing the work he was then doing, and it was not error to give the instruction."

Further, in the absence of evidence to the contrary, we see no difference in principle between the instant case, in the respect now under. consideration, and the evidential effect that is accorded to the finding of a deceased employé's body at a place where his duty had called him. As was said in Maguire v. Fitchburgh Railroad, 146 Mass. 383, 15 N. E. 904, when applying the rule alluded to:

"The jury might well have believed that he was on the track in the performance of his duty and in the exercise of all the care to be expected of a prudent man."

A presumption of performance of duty arises in a variety of circumstances, where there is an absence, as here, of direct testimony on the point in dispute. Worthington v. Elmer, 207 Fed. 306, 309, 125 C. C. A. 50, and citations (C. C. A. 6th Cir.).

It follows from the foregoing considerations of the different grounds urged in support of a directed verdict, that the motion was rightly denied. So far as the requests for special instructions to the jury are concerned, they were embraced in the general charge, except as to features that in our judgment were unsound. The charge of the court was as favorable to the company as its defense justified.

[7] Other errors are assigned, and they have been carefully considered; we are convinced that they were not prejudicial. There is one, however, which we think ought to be specially noticed. It relates to the impaneling of the jury. Counsel for the administrator were permitted to ask the talesmen, separately, upon their voir dire, whether any of them had ever been in the insurance business or had ever been an agent for the Baltimore Fidelity & Casualty Company of Baltimore, Md. One of the talesmen, in answer to the first question, said that he had not, and another one said that he had been in the insur-

ance business, though no answer appears to have been made to the second question. Counsel for the company objected to the questions and requested the court to warn counsel for plaintiff against asking such questions. The court was disposed to allow "a very broad range"; exceptions were reserved, and error is assigned here. The relevancy and the propriety of such questions as these have been the subjects of frequent decision, where they have been presented (a) in the impaneling of a jury, or (b) in the examination of witnesses. A manifest distinction arises concerning the pertinency of the questions when testing the qualifications of proposed jurors and when determining the admissibility of evidence under distinct issues during the trial. The weight of authority favors the allowance of such questions and the answers, where the questions appear to be presented in good faith and for the purpose only of ascertaining the fitness of persons summoned as jurors. Girard v. Grosvenordale Co., 82 Conn. 271, 279, 73 Atl. 747; Blair v. McCormack Construction Co., 123 App. Div. 30, 33, 107 N. Y. Supp. 750, affirmed without opinion, and, in view of the decision below, apparently upon the present question, 195 N. Y. 521, 88 N. E. 1115; Spoonick v. Backus-Brooks Co., 89 Minn. 354, 358, 359, 94 N. W. 1079; Heydman v. Red Wing Brick Co., 112 Minn. 158, 162, 163, 127 N. W. 561; Foley v. Cudahy Packing Co., 119 Iowa, 246, 251, 93 N. W. 284; Iroquois Furnace Co. v. McCrea, 191 Ill. 340, 344, 61 N. E. 79; Swift v. Platte, 68 Kan. 10–14, 72 Pac. 271, 74 Pac. 635; Hoyt v. Independent Asphalt Paving Co., 52 Wash. 672, 677, 101 Pa. 367; Dow Wire Works Co. v. Morgan (Ky.) 96 S. W. 530, 533; M. O'Connor & Co. v. Gillaspy, 170 Ind. 428, 431, and citations at 432, 83 N. E. 738; Goff v. Kokomo Brass Works, 43 Ind. App. 642, 644, 647, 88 N. E. 312; Faber v. C. Reiss Coal Co., 124 Wis. 554, 561, 562, 102 N. W. 1049; V. C. G. M. Co. v. Firstbrook, 36 Colo. 498, 502, 86 Pac. 313, 10 Ann. Cas. 1108; Cripple Creek M. Co. v. Brabant, 37 Colo. 423, 426, 87 Pac. 794; Saller v. Shoe Co., 130 Mo. App. 712, 718, 720, 109 S. W. 794; Rinklin v. Acker, 125 App. Div. 244, 109 N. Y. Supp. 125. As to the scope of inquiry generally allowed to be made of jurors under supervision of a trial court, though not involving questions such as the present, see Connors v. United States, 158 U. S. 408, 413, 15 Sup. Ct. 951, 39 L. Ed. 1033; also Monaghan v. Agricultural Fire Ins. Co., 53 Mich. 238, 245, 246, 18 N. W. 797.

On the other hand, there is a distinct class of decisions forbidding such questions, as well as the answers, while the cause is in course of trial; the theory of these decisions is that, since there are no issues to which the questions and answers can have any relevancy, the real object of the questions is to suggest to the jury that the defendant is protected against loss by an indemnitor not a party to the cause; and the practice occasionally resorted to of so interrogating witnesses is censured, and, except where the designed effect appears to have been completely removed by action of the trial judge, is in effect penalized by reversal of the case in the reviewing court. Kerr v. Brass Mfg. Co., 155 Mich. 191, 194, 195, 118 N. W. 925; Cosselmon v. Dunfee, 172 N. Y. 507, 65 N. E. 494; Hordern v. Salvation Army, 124 App. Div. 674, 676, 109 N. Y. Supp. 131; Frahm v. Siegel-Cooper Co.,

131 App. Div. 747, 749, 750, 116 N. Y. Supp. 90; Manufacturing Co. v. Woodall, 115 Tenn. 605, 609, 90 S. W. 623; Emery Dry Goods Co. v. De Hart, 130 Ill. App. 244, 247, 251; and see Tremblay v. Harnden, 162 Mass. 383, 385, 38 N. E. 972; Dow v. Weare, 68 N. H. 345, 346, 44 Atl. 489.

The instant case of course concerns the relevancy of such inquiries and answers only as they occur in examinations made with reference to impaneling a jury. Where it appears to the satisfaction of the trial judge that the object sought through such inquiries and answers as these is in reality solely to test the qualifications of the proposed jurors, the defendant failing, as here, to show that such indemnity does not exist, we think appropriate questions and answers should be allowed under supervision of the court. We do not see why this might not ordinarily be done effectively by a general question put to the prospective jurors collectively; but we are not disposed to hold that questions may not be allowed and answered individually, where in the sound discretion of the judge such course is deemed necessary. The fact is too well understood to require more than a mere statement that in cases where the right of trial by jury exists litigants are entitled to have their cause tried before an impartial jury; and perhaps the most effective means of securing this end is through an intelligent and legitimate exercise of the right of challenge, both peremptory and for cause.

The record here is open to fair inference that a considerate exercise of the right of challenge was the sole object of the course pursued; and consequently that there was neither abuse of privilege nor of discretion in impaneling the jury. It is not a sufficient answer to say that the jurors were nevertheless advised of the possible existence of indemnity; this is simply to suggest the marked distinction between the two classes of decisions before cited. The reason for the one class is to protect a right; the reason for the other is to guard against a wrong. In other words, any question tending to reveal possible interest or bias of a person offered as a juror is admissible because of its relevancy to the matter of his fitness for such service; the circumstance that the question has the additional effect of suggesting the existence of a fact irrelevant to the merits of the case (indemnity in this instance) is not an uncommon occurrence; this, however, is to be remedied through precautionary instructions of the court. But such a question and the testimony sought to be elicited, as well as their entire effect, become inadmissible, when offered in the course of trial, because of total irrelevancy. The present plaintiff in error relies on decisions pertinent to the latter situation; they are not applicable to the instant case. It should be added that no request was made here, either upon the impaneling of the jury or at the close of the evidence, for an instruction as to the purpose of the inquiries and answers in dispute and the duty of the jurors to disregard them when considering the merits of the cause; and so nothing of this character is before us.

The judgment is affirmed, with costs.